## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JANE C. CALDWELL, )
)
                Plaintiff, )
) **MEMORANDUM OPINION**
        v. ) **AND RECOMMENDATION**
)
LISA P. JACKSON,[1] ) 1:03CV707
Administrator for the United States )
Environmental Protection Agency, )
)
              Defendant. )

      This matter is before the court on remand from the Fourth Circuit, with the instruction for this court to determine whether Defendant should be granted summary judgment as to Plaintiff's retaliation claim under the standards announced in *Burlington Northern & Sante Fe R.R. v. White*, 548 U.S. 53, 126 (2006). Both parties have fully briefed the pending issue on summary judgment. In this posture, the matter is ripe for disposition. The parties have not consented to the jurisdiction of the magistrate judge. Therefore, the summary judgment motion must be addressed by way of recommendation. For the reasons stated below, it will be recommended that the court deny Defendant's motion for summary judgment as to Plaintiff's retaliation claim and that the retaliation claim proceed to trial.

## Background

---

   [1] On January 26, 2009, Lisa P. Jackson became the Administrator for the United States Environmental Protection Agency. Pursuant to FED. R. CIV. P. 25(d)(1), she is automatically substituted as the proper defendant in this action.

Plaintiff is a former employee of Defendant United States Environmental Protection Agency (hereinafter "Defendant" or "EPA"). On July 28, 2003, Plaintiff filed a complaint against Defendant alleging the following claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.: (1) sex discrimination based on disparate treatment and hostile work environment and (2) retaliation for filing an EEO charge. On April 19, 2005, this court granted summary judgment in favor of Defendant as to all claims.[2] *See Caldwell v. Leavitt*, 378 F. Supp. 2d 639 (M.D.N.C. 2005). As for Plaintiff's claim of sex discrimination based on disparate treatment, the court found that Plaintiff did not exhaust her administrative remedies and, in any event, the claim was without merit. *Id.* at 658-59. As for Plaintiff's hostile work environment claim, the court found that although Plaintiff set forth a prima facie claim of hostile work environment based on gender, Defendant produced sufficient evidence to satisfy both elements of the *Faragher* and *Ellerth* affirmative defenses. *Id.* at 659-66; *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 780 (1998). This court also granted summary judgment to Defendant on Plaintiff's retaliation claim, finding that Plaintiff could not show that any of the alleged retaliatory conduct constituted an "adverse employment action"–i.e., she could not show "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

---

[2] More specifically, on this date the district court judge adopted a Recommendation of the undersigned that the court grant summary judgment to Defendant.

responsibilities, or a decision causing a significant change in benefits." *Id.* at 666-68 (quoting *Ellerth*, 524 U.S. at 761).

On June 17, 2005, Plaintiff filed a notice of appeal, challenging the court's findings as to the hostile work environment and retaliation claims. In 2006, while Plaintiff's appeal was pending, the Supreme Court held in *Burlington Northern & Sante Fe R.R. v. White* that to prevail on a Title VII retaliation claim, a plaintiff is not required to show an "adverse employment action defined as a materially adverse change in the terms and conditions of employment." 548 U.S. at 60 (quotations and citations omitted). Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67-68 (quotations and citations omitted).

The plaintiff in *White* was a private employee, and, in reaching its holding, the Court specifically interpreted the language of Title VII that applies to retaliation by private employees. *See id.* (construing 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against [an employee] . . . because [the employee] has . . . made a charge [of discrimination under Title VII")). Of course, claims of retaliation by federal employees are governed by a different section of Title VII, *see* 42 U.S.C. § 2000e-16(d) ("All personnel actions . . . shall be made free from any discrimination based on race, color, sex, or national

3

origin."). The Supreme Court did not expressly state whether its new standard also applies to federal employees.

On January 19, 2007, the Fourth Circuit remanded the case to this court on the sole issue of whether the new *White* standard applies to federal employees such as Plaintiff. On June 18, 2007, this court held that the new *White* standard does not apply to federal employees such as Plaintiff.[3] Therefore, the court did not address Plaintiff's retaliation claim under the new *White* standard–i.e., whether the alleged retaliatory conduct would have dissuaded a reasonable employee from filing an EEO complaint. Furthermore, this court did not address Defendant's contention that it could offer a legitimate, non-retaliatory explanation for its actions.

On August 15, 2008, the Fourth Circuit affirmed in part, reversed in part, and remanded in part this court's initial April 19, 2005, ruling on summary judgment. Specifically, the court affirmed the district court's grant of summary judgment to Defendant on the hostile work environment claim. The court further held that the new *White* standard applies to federal employees. The court therefore reversed this court's ruling on Plaintiff's retaliation claim and remanded "for consideration of the record in light of the new standard." *See Caldwell v. Johnson*, 289 F. App'x 579, 592 (4th Cir. 2008) (unpublished).

---

[3] More specifically, on this date the district court judge adopted a Recommendation of the undersigned finding that *White* does not apply to federal employees.

4

Plaintiff's retaliation claim is now back before this court on summary judgment, with the new standard as announced in *White* applying to Plaintiff's retaliation claim. On February 20, 2009, this court issued an order with a briefing schedule for the parties to address Plaintiff's retaliation claim under the *White* standard. The parties have briefed the issues, and the summary judgment motion as to the retaliation claim is now ripe for disposition.

**Facts**

In 1991, Plaintiff began her employment with Defendant EPA as an Environmental Scientist in the Office of Air Quality Planning and Standards ("OAQPS"). (Caldwell Aff. ¶ 42.) In March 1999, Plaintiff was assigned to work on a detail at EPA's Office of Research and Development ("ORD") in the National Center for Environmental Assessment, Research Triangle Park Division ("NCEA-RTP"), where she was assigned to the Hazardous Pollutant Assessment Group ("HPAG") working under the supervision of HPAG Branch Chief Michel Stevens. (*Id.* ¶¶ 43, 45.) The HPAG branch was one of two branches at NCEA-RTP. The other branch was the Environmental Media Assessment Group ("EMAG"). Robert Elias served as branch chief for the EMAG branch from January 2001 to January 2003. Furthermore, at all relevant times, and unless otherwise specified, Lester Grant was the Director of NCEA-RTP, Randy Brady was Assistant Director, and Chon Shoaf was the Associate Lab Director.

5

In August 2000, Plaintiff became a permanent employee at NCEA-RTP working in the HPAG branch. (*Id.* ¶ 46.) In her complaint, Plaintiff alleges that from April 12, 1999, and continuously until at least April 5, 2001 (when she first initiated EEO contact), and thereafter, she was subjected to ongoing and unwelcome harassment because of her gender and stemming from a hostile work environment within the NCEA-RTP against females, which was in part created and facilitated by her former manager Michel Stevens.[4] Plaintiff also alleges that after she initiated EEO contact, co-workers and management retaliated against her in various ways, as discussed, *infra*.

The EEO Charges

On April 5, 2001, Plaintiff initiated contact with an EEO counselor "concerning my being subjected to disparate treatment and harassment because of gender bias." (*Id.* ¶ 123.) On May 15, 2001, Plaintiff filed a formal EEO complaint. Around that same time, three other female employees–Sharon Taylor, Amy Grady, and Marsha Marsh ("EEO complainants")–also filed EEO complaints against Defendant for alleged sex discrimination and hostile work environment. On July 13, 2001, August 7, 2001, and November 26, 2001, Plaintiff filed supplemental EEO

---

[4] This court's previous ruling on Plaintiff's hostile work environment claim focused heavily on conduct by Stevens as Plaintiff's supervisor. Plaintiff initiated EEO contact on April 5, 2001, and Stevens was removed as Plaintiff's supervisor as of April 23. As discussed, *infra*, at that time Beverly Comfort became Plaintiff's immediate supervisor. Therefore, Stevens' conduct does not play a significant part in the court's analysis of Plaintiff's retaliation claim, since most of the alleged retaliatory events occurred after Stevens was no longer acting as Plaintiff's supervisor.

6

complaints alleging retaliation by both management and co-workers.  On April 29, 2003, the EPA issued a right-to-sue letter.

## Discussion

### Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences.  *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir. 1995).  Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Judges are not "required to submit a question to a jury

7

merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251 (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Id.* at 323.

Plaintiff's Retaliation Claims

As discussed, *supra*, federal employees are protected from retaliation for engaging in certain activity that is specifically protected under Title VII. *See* 42 U.S.C. § 2000e-16(d) ("All personnel actions . . . shall be made free from any discrimination based on race, color, sex, or national origin."). To state a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected EEO activity; (2) a reasonable employee would have found the challenged action so materially adverse that she would have been dissuaded from engaging in the protected EEO activity; and (3) there was a causal connection between the protected activity and the challenged retaliatory act. *See Burlington N. & Sante Fe Ry. v. White*, 548 U.S. 53, 68 (2006).

Under the "materially adverse" standard announced in *White*, the harm suffered by the plaintiff must be "material" or "significant." *See id.* In determining

8

what is material or significant, the Supreme Court stated in *White* that "[c]ontext matters" and "'an act that would be immaterial in some situations is material in others.'" *Id.* at 69 (quoting *Washington v. Ill. Dep't of Rev.*, 420 F.3d 658, 661 (7th Cir. 2005)). The Court offered the following example: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* (citation omitted). The Court further observed that since "petty slights, minor annoyances, and simple lack of good manners" do not normally deter a reasonable employee from complaining about discrimination, these forms of retaliation will usually not constitute conduct that is "materially adverse." *See id.* at 68.

As for showing a causal link between the protected activity and the alleged retaliation, a plaintiff may establish that "the employer had knowledge of the employee's protected activity, and that the adverse . . . action took place shortly after that activity." *Rochon v. Gonzalez*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). Alternatively, courts may also look to circumstantial evidence as a whole (i.e., a "pattern of antagonism" or "evidence of recurring retaliatory animus during the intervening period"). *See, e.g.,*

9

*Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

Finally, under the alternative burden-shifting framework as set forth in *McDonnell Douglas*, once the plaintiff has established a prima facie case of retaliation, the burden then shifts to the defendant to produce admissible evidence that, if believed, would establish that the employer's action was motivated by a legitimate, nondiscriminatory reason. If the defendant provides a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to show that the defendant's stated reason was merely a pretext for invidious discrimination. *See Lettieri*, 478 F.3d at 651 ("The [burden-shifting element] of the *McDonnell Douglas* analysis for [the plaintiff's] retaliation claim proceeds as it did under her discrimination claim.").

Here, the court presents a factual account of the evidence and information contained in the record on summary judgment.[5] For purposes of ruling on Defendant's motion for summary judgment, Plaintiff is entitled to have "her version of matters in dispute accepted, and the benefit of all favorable inferences," *Fisher v.*

---

[5] Because this case has been remanded on Plaintiff's retaliation claim only, the court focuses on the evidence presented on Plaintiff's retaliation claim. The court recounts the facts as presented in the parties' supplemental briefs in light of the *White* ruling, as well as from the evidence initially presented by the parties on summary judgment. Additional facts from Plaintiff's case can also be found in this court's previous ruling and in the Fourth Circuit's opinion on appeal. *See Caldwell v. Leavitt*, 378 F. Supp. 2d 639 (M.D.N.C. 2007), *aff'd in part, rev'd in part, and remanded, Caldwell v. Johnson*, 289 F. App'x 579, 592 (4th Cir. 2008) (unpublished).

*Md. Dep't of Hous. & Cmty. Dev.*, 32 F. Supp. 2d 257, 262 (D. Md. 1998), at least so long as there is proper support in the record under Rule 56 of the Federal Rules of Civil Procedure for her version of events. The following facts are presented in the light most favorable to Plaintiff.

<u>Whether Plaintiff Engaged in Protected Activity</u>

As to the first prong of the prima facie case, it is undisputed that Plaintiff engaged in protected activity from at least April 5, 2001, when she initiated EEO contact, and it is undisputed that NCEA-RTP employees were generally aware of the protected activity. (Marcus Aff. ¶ 6; Alapas Dep., pp. 19-20; Slimak Dep., p. 17; Brady Dep., pp. 23-24; Elias Dep., p. 24; Grant Dep., pp. 102-04.) To this extent, Plaintiff has satisfied the first prong of the prima facie case.

<u>Whether Plaintiff Was Subjected to Actionable Retaliation under the *White* Standard</u>

Plaintiff contends that she has proffered numerous facts that both independently and cumulatively show that she experienced materially adverse actions by Defendant that would dissuade a reasonable employee from making or supporting a charge of discrimination against Defendant. Plaintiff further contends that she has met the causation prong of the prima facie case under both the temporal proximity standard and the pattern of antagonism standard. According to Plaintiff, the retaliatory acts began within one day after Plaintiff and the other EEO complainants engaged in protected activity and continued on a regular basis for more than one year after that.

11

I.   Retaliatory Acts by Co-workers and Anonymous Persons in the Form of Threatening Notes, Emails, Computer Tampering, and Vandalism

Plaintiff first contends that almost immediately after initiating EEO contact she and other EEO complainants experienced retaliatory harassment by both co-workers and anonymous persons.  (*See* Caldwell Aff. ¶¶ 120-22.)  For instance, on or around April 10, 2001, Plaintiff's co-worker Raub engaged Plaintiff in a conversation in which he described a study concerning the average length of a penis.  (*Id.* ¶ 129; Raub Dep., pp. 98-109; Caldwell Dep., pp. 53, 65-67.)  Furthermore, on another day in April 2001, Raub announced to Plaintiff and one of the other EEO complainants (Taylor) that he "had a confession to make," and he then described his "fixation with women's breasts" and his son's interest in pornographic magazines.  (Caldwell Aff. ¶ 153; Taylor Aff. ¶ 35; Raub Dep., pp. 59-65.)

Plaintiff also points to an email that Raub sent to Plaintiff and the other EEO complainants on May 3, 2001.  Raub sent the email, titled "Fussy Females Play Away," to Plaintiff, Marsha Marsh, and Sharon Taylor, as well as to some male employees.  (Caldwell Aff. ¶¶ 168-69.)  The article stated, in part:

> Females interact sneakily with males of their own species.  Ben Sheldon, of the University of Oxford, and colleagues have discovered that females have sophisticated ways of avoiding the pitfalls of their environment when they interact with testosterone-controlled males.

12

(Raub Dep. p. 133, lines 17-23; Pl.'s Ex. 6, attached to Alapas Dep.) After Plaintiff and others complained to management about the email, Raub apologized.[6] (Raub Dep., p. 133, lines 17-23.)

Each EEO complainant also received what Plaintiff describes as threatening notes left anonymously in their chairs. (*See* Caldwell Aff. ¶ 159; Taylor Aff. ¶ 29; Caldwell Dep., pp. 102-05.) On May 29, 2001, Plaintiff discovered an envelope in her chair containing two threatening notes.[7] (Caldwell Aff. ¶ 258; Taylor Aff. ¶ 43.) One note contained a quote from Shakespeare's play *King Lear*, stating "Oh, that madness lies; let me shun that." Plaintiff states that the King Lear quotation was a reference to three treacherous daughters who betray their father, and Plaintiff interpreted the quotation as referring to Plaintiff and the other EEO complainants. (Caldwell Aff. ¶ 266.)

The second note was a one-page document that appeared to be a review of a certain type of tea, which was described in the document as having a "tri-leaf" structure, "with thorns," "overfermented," and "giving a very dark appearance." The review further stated that the tea was "high in caffeine," had a "bitter taste," could be "extremely irritating," that it should not be steeped too long, and that it made good "iced" tea. Plaintiff believes that the tea described in the document was meant to

---

[6] Plaintiff contends that Raub never truly apologized, but that he merely attempted to justify his actions. (*See* Reply Br., p. 7.)

[7] Plaintiff believes that her co-worker Raub placed these anonymous notes in her chair. Raub denies having placed either note in Plaintiff's chair. (Raub Dep., p. 179, line 23.)

symbolize the women who had filed the EEO complaints, i.e., that they were "bitter," could be "extremely irritating," and that they should be "iced." Plaintiff interpreted this note as a "veiled death threat."[8] (Raub Dep., pp. 170-79, Ex. 5, 6; Caldwell Dep., pp. 102-03.)

Finally, Plaintiff contends that she and the other EEO complainants experienced multiple acts of vandalism to their cars while the cars were parked in the EPA parking lot, and that these acts usually coincided with a significant event pertaining to their complaints. (Taylor Aff. ¶ 44; Marcus Aff. ¶ 27.) Plaintiff contends, for instance, that on April 6, 2001, the day that Marsh complained to the EEO, Marsh, while accompanied by Caldwell, found a Phillips head screwdriver in the tire of her car at the EPA parking lot. (Caldwell Aff. ¶¶ 124-25.)

Computer Tampering by Co-workers and/or Management

Plaintiff also contends that from April 2001 and continuously until at least December 2001, the EEO complainants experienced numerous incidents of computer tampering, which Plaintiff believes was done either by co-workers or

---

[8] In her Affidavit, Plaintiff also cites an incident occurring on or around April 27, 2001, in which one of the other EEO complainants, Marsha Marsh, showed Plaintiff a piece of paper that had been attached to Marsh's office chair. It was a poem by Henry Wadsworth Longfellow, which read, "I know a maiden fair to see, Take Care! She can both false and friendly be, Beware! Beware! Trust her not. She is fooling thee." (Caldwell Aff. ¶ 159.) Plaintiff's evidence on summary judgment also includes Taylor's statement in her affidavit that on April 9, 2001, she found an anonymous sign in her office stating: "When the last tree is cut down, the last fish eaten, and the last stream poisoned, you will realize that you cannot eat money." (Taylor Aff. ¶¶ 27, 29.)

14

management.  (*Id.* ¶¶ 156, 202-08, 222; Taylor Aff. ¶¶ 37, 38, 46, 65.)  Specifically, Plaintiff contends that someone was hacking into her and the other EEO complainants' email and reading the emails pertaining to the EEO filings.  (Caldwell Aff. ¶ 206.)

Defendant denies any computer tampering by either management or co-workers and blames Plaintiff's computer troubles on a software "glitch."  Defendant contends that Information Technology ("IT") personnel investigated and found no such computer tampering.  Plaintiff counters that any alleged investigation into computer tampering was merely a sham and that, in fact, the focus of Defendant's "investigation" into the computer tampering was on the EEO complainants and those assisting them.[9]  For example, Plaintiff contends that, as part of the computer tampering "investigation," Assistant Director of NCEA-RTP Randy Brady specifically sought the telephone call logs for EEO complainants Taylor and Marsh along with the union steward, Blumenthal, and surreptitiously monitored their telephone usage. Plaintiff contends that Brady did not, however, monitor the calls of persons who would reasonably have been subjects of the complaints of computer tampering.

---

[9]  For instance, according to Plaintiff, Defendant used persons lacking the proper qualifications to conduct the necessary forensic tests to determine the source of the problems.  Plaintiff contends furthermore that the computer technician never even examined Plaintiff's computer, nor did the technician talk to her about her computer problems.

Mass Alienation, Shunning, and Bad-Mouthing by Co-workers and Management

Plaintiff further contends that soon after the EEO complainants filed their formal EEO complaint on May 15, 2001, Les Grant, the then-acting NCEA-RTP Director, instructed all of the employees at NCEA-RTP not to interact with the EEO complainants, thus encouraging mass alienation of the EEO complainants by management and staff.[10] Plaintiff further contends that the EEO complainants were also discussed openly in a disparaging and highly inappropriate manner during branch meetings.

Finally, as to all of the acts of co-worker retaliation, or retaliatory acts by unidentified persons, Plaintiff contends that she repeatedly complained to management about the ongoing retaliatory harassment at the workplace, but that Defendant did nothing to remediate the co-worker harassment. Plaintiff contends that management in D.C. merely instructed Plaintiff to "contact the appropriate officials" in Plaintiff's management organization, and Plaintiff's direct manager merely inquired whether Plaintiff had included all of her allegations of retaliation in the EEO complaint. According to Plaintiff, her managers never interviewed her or otherwise spoke with her about her complaints. Rather, Plaintiff's managers

---

[10] Defendant contends that Plaintiff has mischaracterized Grant's instructions. According to Defendant, Grant merely asked the other NCEA-RTP employees not to "do anything that would be considered confrontational" and to "just interact in a collegial manner" when the EEO complainants moved from the Catawba building. (*See* Raub Dep., pp. 73-74.)

16

scrutinized the telephone calls of the EEO complainants and their union steward, who they eventually terminated, but not those of any of the other employees. Plaintiff further contends that EPA's managers never interviewed "critical suspects or witnesses." In sum, Plaintiff contends that Defendant failed to provide Plaintiff with prompt and remedial action in response to her numerous complaints of retaliatory harassment by co-workers and unidentified persons.

While the Fourth Circuit does not yet appear to have addressed co-worker harassment as part of a retaliation claim in light of the new *White* standard, at least one other circuit court of appeals has. In *Hawkins v. Anheuser-Busch, Inc.*, the Sixth Circuit observed:

> As *Burlington Northern* made clear, however, the tests for harassment and retaliation are not coterminous. The courts must evaluate whether the retaliatory act would "dissuade a reasonable worker from making or supporting a charge of discrimination" when determining whether an employer's response to co-worker retaliation is indifferent or unreasonable. *Burlington Northern,* 126 S.Ct. at 2409. Taking into account our caselaw and the guidance provided by *Burlington Northern,* we hold that an employer will be liable for the co-worker's actions if (1) the co-worker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the co-worker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *See Burlington Northern,* 126 S.Ct. at 2415; *Blankenship,* 123 F.3d at 872-73.

517 F.3d 321, 347 (6th Cir. 2008).

17

I find that the test announced by the Sixth Circuit offers solid guidance as to how to evaluate a claim of retaliation by co-workers under the *White* standard. That is, a court must find that the retaliation by co-workers would have dissuaded a reasonable employee from filing a charge of discrimination, that supervisors knew or should have known about the retaliatory conduct by co-workers, and that supervisors condoned, tolerated, or failed to respond adequately to end the retaliatory conduct. Applying this test, I find that Plaintiff has not proven a prima facie case of retaliation based on the alleged retaliatory conduct of co-workers and unidentified persons. First, as for Plaintiff's contentions regarding "retaliatory" conduct by her co-worker Raub, Plaintiff has not shown a causal link between Plaintiff's EEO filings and Raub's conduct towards her. That is, there is no evidence that Raub knew about Plaintiff's protected activity when he sent the email and had the offensive conversations. As Defendant notes, Plaintiff stated that she did not discuss her plans for filing an EEO complaint with Raub and that she had never discussed her intent to file the EEO case with Raub. (*See* Caldwell Aff. ¶¶ 130, 154.) In any event, EPA's response to Raub's conduct was prompt and reasonably calculated to end it. Brady immediately met with Raub and counseled him, and Raub soon thereafter apologized for his conduct.

Next, as for Grant's alleged instructions to EPA employees not to interact with Plaintiff, even if the court accepts Plaintiff's version of what Grant said as true, this is not actionable retaliation. It appears to be well settled that shunning or being rude to an employee because the employee filed an EEO complaint is not in and of itself

18

sufficient to constitute retaliation. *Roldan v. Chertoff*, No. 04cv2515, 2006 WL 4632503, at *10 (S.D. Cal. Oct. 19, 2005) ("'Badmouthing' or being mean to an employee within the workplace is not actionable.") (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)). Furthermore, as to Plaintiff's allegations that certain co-workers and managers made disparaging remarks about Plaintiff and the other EEO complainants, it is well established that Title VII was not intended to protect against mere rudeness in the workplace. Indeed, the Supreme Court in *White* specifically reiterated the Court's prior holdings that Title VII "does not set forth 'a general civility code for the American workplace.'" *White*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The Court reasoned that the anti-retaliation provision of Title VII "prohibit[s] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers" and that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

As for Plaintiff's claims of retaliation based on threatening anonymous notes left in her chair, vandalism of her car in the EPA parking lot by anonymous persons, and computer tampering, Plaintiff has not shown a causal link between these acts and her EEO filings because Plaintiff has not identified the person or persons who committed these retaliatory acts. Plaintiff has admitted that she does not know who did any of these acts; thus, these acts cannot be imputed to Defendant, and she

19

cannot make out a prima facie case of retaliation based on acts by anonymous persons. (*See* Caldwell Dep., pp. 101, 102, 103, 129.) *See Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (where the plaintiff's vehicle was damaged and the plaintiff speculated that a co-worker had done it, the plaintiff could not show that the retaliation was causally related to her complaint of discrimination).

In sum, for the reasons stated herein, Plaintiff has not set forth a prima facie case of retaliation by co-workers and anonymous persons under the *White* standard.

II.  Retaliatory Acts by Management

Plaintiff also alleges various acts of retaliation against her by management at NCEA-RTP.

Defendant's Firing of Greg Blumenthal As an Act of Retaliation Against Plaintiff for Filing the EEO Charges

First, Plaintiff classifies as an act of "retaliation" the firing of a co-worker who had assisted Plaintiff and the other EEO complainants with filing their EEO charges. On June 13, 2001, Defendant fired Greg Blumenthal and he was marshaled out of the office by four armed guards.  Plaintiff contends that the use of armed guards to remove Blumenthal "had a profound effect of causing fear and intimidation to the EEO complainants."  (Pl.'s Br. p. 7; Caldwell Aff. ¶¶ 336-38.)  Plaintiff notes that George Alapas, the Acting Director of NCEA headquarters in Washington, D.C., testified that he "was stunned" by the act of Blumenthal's firing as well as the "way it was done."  (Alapas Dep., pp. 128-30.)

I find that Plaintiff has not shown a causal connection between her EEO filing and the firing of Greg Blumenthal; therefore, she has not shown a prima facie case of retaliation based on Blumenthal's firing. The record shows that Blumenthal was terminated in June 2001 before the end of his one-year probationary period because he accessed the EPA server without authorization and because he was not making satisfactory progress in performing and completing key work assignments. (Brady Decl., ¶ 13.) The fact that Blumenthal was sympathetic to the plight of Plaintiff and the other EEO complainants is not in itself enough evidence to infer that Defendant fired Blumenthal as some form of retaliation against Plaintiff and the other EEO complainants. Therefore, Plaintiff fails to satisfy a prima facie claim of retaliation as to the firing of Greg Blumenthal.

Brady's "Notice of Warning" to Plaintiff and other EEO Complainants regarding Improper Contact with a Contractor

Next, Plaintiff contends that her manager Brady retaliated against her by issuing an unfounded, written reprimand against her and the other EEO complainants. Specifically, on June 4, 2001, Brady issued Plaintiff and the other EEO complainants a "notice of warning" of disciplinary action for alleged improper contact with a contractor. (Caldwell Aff. ¶ 290.) Brady eventually rescinded the notice of warning, and the warning was never placed in Plaintiff's personnel folder.[11]

---

[11] According to Brady, he rescinded the letter of warning because Plaintiff and the other EEO complainants were moving out of the Catawba building and "they would no longer be interacting with our contractor work force . . . [s]o there was absolutely no reason to keep

Defendant contends that the notice of warning by Brady cannot constitute retaliation under the new *White* standard. Defendant notes that Plaintiff did not suffer any adverse consequences from the notice of warning, which Defendant describes as "no more than a reminder to Plaintiff to follow EPA policy." (Def.'s Br., p. 14.) Defendant further notes that although Title VII protects employees from retaliation on account of their assertion of protected rights, a complaining worker is not automatically insulated from complying with the employer's standard policies. *See Ziskie*, 547 F.3d at 229. In sum, Defendant contends that a reasonable employee would not have been dissuaded from filing a discrimination charge after receiving a notice of warning about improper contact with a contractor.

I find that the notice of warning issued by Brady is sufficiently "materially adverse" to constitute actionable retaliation under *White. See Ram v. N.M. Dep't of Env't*, No. Civ. 05-1083 JB/WPL, 2007 WL 5239192, at *36 (D.N.M. July 6, 2007) (observing that written warnings, letters of reprimand, and performance of development plans can be materially adverse actions for purposes of a retaliation claim under the *White* standard). Furthermore, Plaintiff has shown the requisite causal connection between the notice of warning and Plaintiff's filing of the EEO

---

the letter of the notices of warning in effect . . . ." (Brady Dep., p. 284, lines 9-17.) Plaintiff contends, however, that the EEO complainants had already moved from the Catawba building on July 6, 2001, when Brady first refused a request by the union representative to withdraw the notices. (Brady Dep., pp. 276-78, Ex. 44.). Plaintiff further contends that Brady's decision to withdraw the notices coincided with another manager's discovery that Brady had been untruthful when he denied monitoring the telephone logs of Taylor, Marsh, and Blumenthal.

charges. Indeed, Plaintiff initiated EEO contact April 5, 2001, she and the other EEO complainants filed the formal EEO charge of discrimination on May 15, and Brady issued the warning specifically to Plaintiff and the other EEO complainants several weeks later on June 1, 2001. Plaintiff has clearly satisfied temporal proximity.

Next, although Defendant offers as a legitimate reason for the warning that Brady was simply advising Plaintiff and the other EEO complainants against improper contact with contractors, the record suggests that the warning was too harsh and not warranted; thus Plaintiff has presented enough evidence of pretext to withstand summary judgment. For instance, Plaintiff has presented evidence that D.C. Manager Mike Slimak testified that he believed that Brady had "singl[ed] out" Plaintiff and the other EEO complainants by issuing the notice and was "moving in a retaliatory fashion" against them.[12] (*See* Slimak Aff. p. 6, attached to Slimak Dep. as MS-5; Slimak Dep., pp. 188-89, Ex. 53, p. 6.) Another D.C. manager, Mike Alapas, also admitted that Brady's issuance of the notices of warning was "over retaliation" and "too harsh." (Alapas Dep., pp. 128-30; Slimak Dep., pp. 44-45.) Finally, Plaintiff flatly denies violating any EPA policy; two of the other EEO complainants (Taylor and Marsh) reported to Brady that Plaintiff was not even

---

[12] In late June 2001, Defendant sent Slimak, NCEA's Associate Director for Ecology from Washington, D.C., to serve as NCEA-RTP's Acting Director. As discussed in this court's previous ruling, the decision to send Slimak to the NCEA-RTP office was an effort by EPA management in D.C. to respond to and address the claims of hostile work environment by Plaintiff and the other EEO complainants. See *Caldwell v. Leavitt*, 378 F. Supp. 2d 639, 665 (M.D.N.C. 2005).

involved in the discussion at issue regarding the contractor; and Brady never even talked to Plaintiff about the warning before he issued it. (Caldwell Aff. ¶ 292; Brady Dep., pp. 155-57, Ex. 17 at *1, *11.) In sum, a fact finder could infer from all of this evidence that Brady issued the warning on June 1 not because he thought that Plaintiff was violating Defendant's policy against improper contact with independent contractors but, rather, as a tool to retaliate against Plaintiff and the other EEO complainants for bringing their EEO complaints just several weeks before that. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). For all of these reasons, I find that Plaintiff has presented evidence sufficient to withstand summary judgment on her retaliation claim based on the notice of warning issued by Brady.[13]

_____

[13] Perhaps if the notice of warning by Brady were the *only* alleged act of retaliation in this case, the court would reach a different result. As I discuss, *infra*, however, Plaintiff also satisfactorily presented evidence of additional conduct by Defendant that, when considered *cumulatively* with Brady's notice of warning, could constitute actionable retaliation under *White*. That is, Plaintiff has also presented evidence that she and the other EEO complainants were forced to work in substandard office conditions for more than six months after they were moved away from the Catawba building. The Supreme Court in *White* specifically instructed that "context matters" and that a court must consider all of the circumstances and specific facts in determining whether a reasonable employee would have been dissuaded from filing an EEO charge. *See Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787-88 (8th Cir. 2007) ("Nothing in *White* precludes this court from considering an employer's actions cumulatively when determining whether a reasonable employee would be dissuaded from making a discrimination claim."); *Sanford v. Main St. Baptist Church Manor, Inc.*, Nos. 07-5869, 07-5905, 2009 WL 1410994, at *11 (6th Cir. May 20, 2009) (unpublished) ("Here, while some of the incidents alone may not rise to the level of an adverse employment action, the incidents taken together might dissuade a

<u>Defendant's Failure to Provide Plaintiff with Necessary Business Supplies,</u>
<u>Furnishings, and or Services for More than Six Months As an Act of Retaliation</u>
<u>Against Plaintiff for Filing the EEO Charges</u>

By the end of June 2001, pursuant to their requests, Plaintiff and the other EEO complainants were moved away from the Catawba office building (the "Catawba building") into a different building because they had begun to fear for their personal safety. (*See* Caldwell Aff. ¶ 417.) Plaintiff states that for at least the next six months, she and the other EEO complainants were placed in sub-standard office spaces and were moved numerous times, without the necessary work tools, including sufficient office furniture, computers, email and voicemail access, telephones, and basic professional support. Plaintiff contends that management also interfered with their ability to receive office mail. (*See id.* ¶¶ 494, 549, 552, 555.) Plaintiff contends that even though she had requested to have her mail forwarded to her home address, her supervisor Beverly Comfort delayed forwarding

---

reasonable worker from making or supporting a discrimination charge."); *Flynn v. N.Y. State Div. of Parole*, No. 07 Civ. 5821(WCC), 2009 WL 1204349, at *22-23 (S.D.N.Y. Mar. 6, 2009) (stating that although each act of retaliation might not be actionable when considered "in isolation," when the acts of retaliation "are viewed collectively, a reasonable jury might find that [the acts of retaliation] would dissuade a reasonable employee in plaintiff's position from reporting gender discrimination"); *Martin v. Gates*, Civil No. 07-00513 JMS/BMK, 2008 WL 4657807, at *10 (D. Haw. Oct. 20, 2008) (acknowledging that "actions found insufficiently adverse when considered individually may collectively rise to the level of a materially adverse employment action"). Therefore, this court may consider the acts of retaliation cumulatively in assessing whether they meet the *White* standard.

Plaintiff's mail to her until around six or seven weeks after having initially received it.[14]  (Caldwell Aff. ¶¶ 468-70, 558, 573.)

Plaintiff further contends that she had asked Comfort to keep Plaintiff updated about office matters by conference phone for weekly branch meetings and to provide her with a call-in number, but that Comfort never contacted Plaintiff with a call-in number.  (*Id.* ¶¶ 468, 470.)  Indeed, according to Plaintiff, Comfort never contacted Plaintiff after Plaintiff left the Catawba building, and Plaintiff was therefore not able to participate in branch meetings once she left the building.  (*Id.*)

Plaintiff further contends that her lack of email access caused her to miss important work and project meetings as well as significant travel opportunities for the entire upcoming year.  (*See id.* ¶¶ 471-75.)  Plaintiff further contends that Comfort personally set up meetings for the MTBE Assessment (for which Plaintiff was the Chemical Manager) without inviting Plaintiff to the meeting, which in effect undermined Plaintiff's work on this important project.  (*Id.* ¶¶ 484-85.)

Plaintiff contends that she remained "shunned" and isolated from the entire branch even after she had complained to Slimak about the retaliatory treatment, and that the retaliatory treatment significantly impaired Plaintiff's ability to do her work. (*Id.* ¶¶ 470, 539, 549.)  Plaintiff contends that her lack of email access particularly impeded her work performance.  According to Plaintiff, she and the other EEO

---

[14]  Plaintiff contends that Slimak admitted that he faced insubordination from staff and management when he tried to have Plaintiff's mail forwarded to her, but she contends that no disciplinary action was ever taken.  (Slimak Dep., pp. 188-89, Ex. 53, pp. 6-7.)

complainants also continued to experience telephone and computer tampering after they were moved out of the Catawba building. Plaintiff contends that although she repeatedly complained to management about the substandard office conditions, management did nothing to remediate the problem, even though management (specifically Slimak) admitted that NCEA-RTP management was acting in a retaliatory fashion towards Plaintiff and the other EEO complainants. Plaintiff alleges that Defendant's failure to provide her with adequate office equipment was a direct act of retaliation against her for filing her EEO complaint.

Plaintiff cites numerous instances in which she complained to management about her ongoing problems with lack of proper office equipment and the substandard working conditions. For instance, on July 11, 2001, Plaintiff sent Slimak an email from her home account to complain about the lack of sufficient office equipment since she had been moved from the Catawba building, and the lack of communication with her supervisor Comfort. (*Id.* ¶ 510.) Plaintiff further complained to Slimak about being hindered in her work by the lack of email and regular email access. (*Id.* ¶ 518.) According to Plaintiff, Slimak failed to respond or otherwise remediate the problem.

On August 7, 2001, Plaintiff supplemented her EEO complaint to include additional allegations concerning the retaliation, and she continued to complain to management about the conditions. (*Id.* ¶ 561.) Furthermore, on November 26, 2001, Plaintiff reported the ongoing retaliation to the EEO specialist and

supplemented her EEO complaint a third time to reflect the continuing retaliation. (*Id.* ¶¶ 632, 657.)

On October 29, 2001, and again on December 5, 2001, Plaintiff complained to management that she still had no telephone assigned to her, that she had none of the necessary software installed on her computer, and that the failure of management to provide her with this equipment significantly interfered with her productivity. (*Id.* ¶¶ 620, 638, 640.) Plaintiff provided a detailed listing of the substandard office and work conditions and how they had affected her work performance for the previous six months. (*Id.* ¶ 640.) On December 10, 2001, Plaintiff complained again to management about the lack of word processing software on her computer. (*Id.* ¶ 644.) On December 12, 2001, in her third move since June 2001, Plaintiff was relocated to an abandoned wing of the ERC building to an office equipped again without office supplies, a copier, printer, mailbox, technical support, or collegial support. (*Id.* ¶ 650.) On December 18, 2001, Plaintiff again emailed EPA management to complain about the substandard office conditions. (*Id.* ¶ 651.)

In response, Defendant first notes that Plaintiff specifically requested to be moved away from the Catawba building and into a different building. Defendant further contends that Plaintiff assured manager Alapas that she could be flexible as to where she was to be moved and that she specifically told Alapas to "get us out to other quarters–professional or not." (Alapas Dep., Ex. GA-36.) Defendant further

contends that the record does not support Plaintiff's claim that her office conditions after the move were in fact "grossly substandard." Defendant notes that Plaintiff admits that after she moved, she made outgoing calls, had full access to a computer, was able to work off of her laptop computer, and was able to use her home e-mail to communicate. (*See* Caldwell Aff. ¶ 494.) Defendant further notes that when Plaintiff moved away from the Catawba building, the IT person responsible for her computer support, Nancy Broom, was on vacation. Defendant notes that when Broom returned to work, she contacted IT personnel to find out where Plaintiff had moved to have Plaintiff's email transferred. (Slimak Dep., Ex. MS-30.)

In support of its argument that Plaintiff's office conditions were not substandard, Defendant notes that after Plaintiff was moved out of the Catawba building, Plaintiff wrote Slimak "to let him know how relieved [she] was of the move and that [she] was starting to focus on the MTBE assessment again." (Caldwell Aff. ¶ 496.) In addition, on June 29, 2001, Plaintiff wrote to Slimak:

> I cannot tell you the relief to be out of the building. I was able to focus on MTBE today . . . I am shifting gears and going full steam ahead on finishing the MTBE assessment. Now that I am in a safe place I can focus on it. . . . . Thank you [sic] so much for everything!!!!! Jane C. Caldwell.

(Slimak Dep., Ex. MS-19.) Defendant also notes that Plaintiff also said that "things are going well on this front" and that "[c]onference calls work well for me. As I said, I work as well on the phone as down the hallway." (Slimak Dep., Ex. MS-22, MS-26.)

Defendant further notes that Plaintiff gave her phone number to members of her team and to managers Alapas and Slimak, that she was able to email a rough schedule for completion of the MTBE Assessment, and that she was generally able to send email messages and communicate by phone with various other persons and communicate with Slimak about the MTBE project. (*See* Caldwell Aff. ¶¶ 498, 500, 512-13, 518.) Defendant further notes that in her deposition, Plaintiff admitted that she "was able to get [her] work done" and "able to complete successfully the work." (GE D, Caldwell Dep., p. 124.)

As for Plaintiff's claim that she suffered retaliation when her mail was delayed and she was not notified about branch meeting and project conferences, Defendant contends that the record shows that Plaintiff initially indicated that she was going to pick up her mail at the Catawba building. (Slimak Dep., Ex. 53, Slimak Aff., p. 3.) Although Slimak tried to get NCEA-RTP secretaries to forward Plaintiff's mail, they did not want to touch it for fear of being accused of mismanaging it. (*Id.*) Slimak then tried to arrange for a different mail drop. (*Id.*) Defendant contends that even assuming that there was a delay in the delivery of mail to Plaintiff, the record shows that Defendant's actions in trying to get Plaintiff's mail delivered were reasonable. According to Defendant, Plaintiff fails to point to any evidence that she suffered any material harm as a result of delayed mail delivery.

Defendant further contends that as to Plaintiff's claim that she was not informed about meetings and project conferences, her own testimony shows that

persons who had not filed EEO claims, including Slimak, Alapas, and Bill Farland, were also not informed about meetings. (*See* Caldwell Aff. ¶ 593.) Defendant contends that, significantly, Plaintiff fails to show that there was any detrimental impact on her work. Finally, Defendant contends that although Plaintiff asserts that her supervisor Comfort's actions were retaliatory, there is no evidence to support her belief.

In response to Defendant's contentions, Plaintiff admits that she requested to be moved from the Catawba building, but she says that she made this request merely because she "was so desperate and fearful of the retaliation she experienced in the work environment that she sought to be transferred immediately for her personal safety." (Pl.'s Reply Br., p. 4; Alapas Dep., Ex. GA-36.) Plaintiff states that she never acquiesced to complete lack of the necessary email, computer software, telephone capabilities, voicemail, and ability to receive mail in a timely manner for more than six months. As for Plaintiff's note on June 29, 2001, expressing her relief over being out of the Catawba building and that she was "shifting gears and going full steam ahead," Plaintiff contends that Defendant's assertion that Plaintiff had no problems once she was in the new building is misleading. Plaintiff notes that on June 29 Plaintiff had *just* been moved out of the Catawba building, and this statement was not a general statement Plaintiff made regarding the conditions of her office. Furthermore, although Plaintiff admitted in her deposition that she was able

31

to get her work done, this single admission was part of a larger answer offered by Plaintiff in her deposition:

> I was terrorized. I had to try to work in an environment where I was afraid to use my own computer. I had to try to acquire, at my own expense, a laptop and to take my files back and forth from home and to work on that computer. I was able to get my work done, but I was constantly having to respond to hostile emails, allegations, and to be in a terrorized and stressful environment. My ability to do work was compromised, but I was able to complete successfully the work.

(GE D, Caldwell Dep., p. 124.) According to Plaintiff when reviewed in context, it is clear that Plaintiff was stating that she was able to complete her work, *despite* all of the retaliatory harassment.

I find that, in viewing the evidence in the light most favorable to Plaintiff, a jury could find that Defendant retaliated against Plaintiff for her filing the EEO complaint by providing her with substandard office conditions once she was moved out of the Catawba building. Furthermore, this act of retaliation could dissuade a reasonable employee from filing an EEO charge.[15] Next, Defendant has failed to establish a legitimate, nondiscriminatory reason for subjecting Plaintiff to substandard office conditions for six months. Defendant contends merely that it has offered a legitimate, non-retaliatory reason for moving Plaintiff–because Plaintiff herself asked

---

[15] As noted in this court's prior ruling on summary judgment, Plaintiff cites to other acts of alleged retaliation by NCEA-RTP management in her complaint and affidavit. *See Caldwell*, 378 F. Supp. 2d at 647. For instance, she contends that NCEA-RTP Director Lester Grant delayed and interfered with various promotion and work opportunities; that management intentionally delayed the approval and forwarding of Plaintiff's promotion package; and that management delayed getting Plaintiff approved for "flexiplace." Plaintiff, however, does not appear to pursue these as retaliatory acts in her supplemental brief submitted to the court in light of *White*.

to be moved.  As noted, although Plaintiff admits that she requested to be moved from the Catawba building, she adamantly denies that she ever agreed to work in substandard office conditions.  In other words, the alleged retaliation was not the move, but the fact that for more than six months Plaintiff was forced to work with no direct telephone line, voicemail capabilities, computer word processing, and other necessary computer software.  Furthermore, Defendant provides no explanation or legitimate reason as to why Plaintiff was deprived of sufficient office equipment and supplies for more than six months.  Indeed, rather than providing a reason, Defendant has simply denied that the office conditions were substandard.  To be sure, whether the office conditions were substandard is a disputed issue of fact, and the parties' tit-for-tat factual contentions over the office conditions are best left for a jury to sort out.  Therefore, I find that Plaintiff has satisfied the prima facie case of retaliation based on Defendant's alleged failure to provide Plaintiff with adequate office equipment for more than six months.

Finally, I find as significant that Plaintiff has proffered evidence of a pattern of antagonism from management at NCEA-RTP towards the EEO complainants, which supports Plaintiff's argument that management intentionally failed to provide her and the other EEO complainants with proper office conditions and that Brady issued the written warning specifically to retaliate against Plaintiff and the EEO complainants. More specifically, Plaintiff has presented evidence that at various times before the EEO filings, managers at NCEA-RTP warned several employees that management

33

would retaliate against persons who either filed EEO charges or persons who sympathized with those who did. For instance, Plaintiff's co-worker Allen Marcus sympathized with Plaintiff and the other EEO complainants, and he assisted them with filing their EEO complaints. According to Marcus, in Spring 2001 Grant told Marcus, "There's a lot of activity here involving cases and attorneys. I hope you're not involved in it, because everybody who is involved in it is going to be hurt by it–hurt badly–and that includes you." (Marcus Aff. ¶¶ 6-7, 9-11.) Plaintiff's fellow EEO complainant Sharon Taylor states that in February 2001 she complained to Grant about the hostile work environment against her and the other female scientists at NCEA-RTP. According to Taylor, Grant responded by yelling at Taylor that she had "better never report anything to [NCEA-DC]" and that he also warned her that he could terminate her "at any time without any reason." (Taylor Aff. ¶¶ 14-20.) Taylor further states that within 24 hours of when she informed her supervisor Rob Elias that she was going forward with her EEO complaint, Elias and Grant abruptly removed all her work from a previously assigned project. (*Id.* ¶¶ 22, 31.) Taylor contends that Grant and Elias subsequently attempted to bribe Taylor by reinstating her projects and offering her a promotion if she did not report anything to EEO and if she would agree falsely to deny everything that she had previously reported.[16] (*Id.* ¶ 27.)

_____

[16] Elias denies bribing Taylor. In fact, he contends that he never discussed the complaint with Taylor. (*See* Elias Dep., pp. 35-37; p. 38, lines 3-10.)

Taylor further states that on April 10, 2001, after the EEO complainants had initiated EEO contact, Brady walked into Taylor's office, handed her a paper on the Florida panther, and told her that he would make sure that she would never work on such species of wildlife again if she pursued an EEO complaint; on May 23, 2001, he told her she could not attend a Wildlife Disease Association meeting; and he subsequently told her that she should not have reported anything to EPA headquarters in D.C.  (Taylor Aff. ¶¶ 30, 41.)  Taylor further states that on June 19, 2001, Brady said "something to the effect that 'we got Greg [Blumenthal] fired and we'll get you to [sic], and you are going to get hurt.'"  (*Id.* ¶ 61.)  Finally, Plaintiff also points to a statement made by manager Slimak on July 10, 2001, that he was "convinced" that the EEO complainants had been "targeted by NCEA-RTP management."  (Grady Dep., p. 10.)

Defendant contends that the above statements do not demonstrate a retaliatory bias by management at NCEA-RTP, nor do they contain any evidence linking a retaliatory bias to any adverse action.[17]  Defendant contends generally that Plaintiff has taken the statements out of context and that they were not threats of retaliation by management against persons who brought EEO charges.   For

_____

[17]  Significantly, Defendant admits that at least some of these conversations took place. To the extent that Defendant denies that various conversations took place, this is a disputed issue of fact for a jury to resolve.  Furthermore, I note that although Defendant has not made an issue of it in its brief, these statements are either not hearsay because they are offered to show state of mind and not for the truth of the matter asserted, or because they constitute an "admission by a party opponent."  *See* FED. R. CIV. P. 801(c), (d)(2).

35

instance, as to the conversation between Marcus and Grant, Defendant contends that Grant was not referring to the EEO filings when he spoke of a lot of "cases" and lawyers. Defendant contends that, likewise, Grant's conversation with Taylor in February 2001 concerned Grant's reaction to Taylor's pursuit of a promotion, not the EEO process. Defendant further contends that Grant had merely threatened to fire Taylor if she reported their conversation to "headquarters," and that he was not threatening to fire her if she went to the EEO office.

I first note that although the above-cited statements were not made specifically to Plaintiff herself, they are relevant and admissible to show a pattern of antagonism and retaliatory animus by management at NCEA-RTP towards persons who filed EEO charges. That is, a jury could infer from Plaintiff's proffered evidence that management at NCEA-RTP was hostile to employees who brought EEO complaints and that management actively sought to discourage employees from filing EEO complaints. *See Ziskie*, 547 F.3d at 224-25 (stating that "evidence about how other employees were treated in [the] same workplace can be probative of whether the environment was indeed a . . . hostile one") (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001) (rejecting the contention that only conduct directed at the plaintiff could be considered in evaluating a hostile work environment claim, and stating that "whatever the contour's of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor")). Furthermore, I note that Defendant portrays the conversations between management and the EEO

36

complainants in a light most favorable to Defendant–for instance, portraying Grant's statement to Taylor on February 26, 2001, as a threat of termination if she reported their conversation to headquarters, not as a threat of termination if she went to the EEO office. On summary judgment, however, the court must view the evidence in the light most favorable to Plaintiff, and it is perfectly reasonable to construe Grant's statement as a threat that he would retaliate against Taylor if she filed an EEO complaint.

In sum, Plaintiff has presented sufficient evidence to withstand Defendant's summary judgment motion on Plaintiff's retaliation claim. Brady's notice of warning, coupled with the treatment of Plaintiff and the other EEO complainants with regard to substandard office conditions, *if believed*, could have dissuaded a reasonable employee from bringing an EEO charge. In other words, Plaintiff has presented evidence sufficient to create a genuine issue of fact as to whether Defendant's

alleged retaliation would have dissuaded a reasonable employee in Plaintiff's position from complaining of unlawful discrimination.[18]

## Conclusion

For the reasons stated herein, under the standards articulated in *White*, I find that, in construing the facts in the light most favorable to Plaintiff, Plaintiff has proffered sufficient evidence raising genuine issues of fact as to whether Defendant

---

[18]    In various parts of its brief Defendant has misstated the burden of proof for a retaliation case under the new *White* standard. Defendant first argues in its brief to state a prima facie claim for retaliatory harassment, Plaintiff must show a work environment permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. (*See* Def.'s Br., p. 11.) In light of the Supreme Court's decision in *White*, however, the standard is whether the retaliation is sufficiently severe or pervasive to cause a reasonable employee to be dissuaded from making a charge of discrimination. Defendant argues at another point in its brief that the court should grant summary judgment to Defendant on Plaintiff's retaliation claim because the alleged retaliation did not cause her any "material harm," in that it had no effect on her employment. (*See* Def.'s Br. , p. 10-11) (arguing that "[t]here is insufficient evidence that substandard working conditions interfered with Plaintiff's job" and "[n]o reasonable juror could find that Plaintiff's move and resulting change in her working conditions amounted to material harm"). In arguing as such, Defendant incorrectly again relies on a pre-*White* standard. As another court recently stated, under *White* "the touchstone for 'material adversity' is deterrence." *Rattigan v. Holder*, 604 F. Supp. 2d 33, 52 (D.D.C. 2009) (quoting *White*, 548 U.S. at 68 (noting that the function of Title VII's anti-retaliation provision is to prohibit employer actions "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers") (internal quotation marks omitted)). Therefore, the relevant question on summary judgment is whether, taking all of the evidence in the light most favorable to the plaintiff, and considering all of the alleged retaliatory actions in context, a jury could find that a reasonable employee would have been dissuaded from engaging in protected activity. In other words, "whether an action is 'materially adverse' is determined by whether it holds a deterrent *prospect* of harm, and not by whether the harm comes to pass or whether any effects are felt in the present." *Rattigan v. Holder*, 604 F. Supp. 2d at 52 (emphasis in original); *see also Martin v. Gates,* Civil No. 07-CV-513 JMS/BMK, 2008 WL 4657807, at *10 (D. Haw. Oct. 20, 2008) (reviewing post-*White* cases and noting that "the court does not focus on actual harm but on the potential for deterrence").

38

retaliated against her for engaging in protected activity under Title VII. In sum, Plaintiff is entitled to have her retaliation claim tried before a jury. For these reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (docket no. 67) as to the retaliation claim be **DENIED**.

_____
WALLACE W. DIXON
United States Magistrate Judge

August 11, 2009